**BARCLAY**

v.

**MONTGOMERY–WARD & CO., Inc.**

No. 4958.

Court of Civil Appeals of Texas.

Beaumont.

June 3, 1954.

Rehearing Denied June 24, 1954.

446

Collins, Garrison, Renfrow & Zeleskey, Lufkin, for appellant.

Mantooth & Denman, Lufkin, for appellee.

WALKER, Justice.

On the morning of September 19, 1950, at 11:00 o'clock or near that time, the plaintiff's wife slipped and fell upon the floor of defendant Montgomery-Ward & Company's place of business in Lufkin, Texas, and sustained injuries to her person; and the plaintiff brought this action to recover damages for said injuries and consequences thereof. The plaintiff plead for cause of action that his wife was an invitee in defendant Montgomery-Ward & Company's place of business and that said defendant's employee Myrtis Caldwell, whose duty it was to clean the floor of this place, had negligently caused this floor to be slippery by applying some unidentified substance to it. Other persons, employees of the defendant Montgomery-Ward & Company, and their husbands were parties defendant to this suit but were dismissed and are not parties to this appeal, and Montgomery-Ward & Company will be referred to hereinafter simply as the defendant.

The cause was tried to a jury and among other facts the jury found (Issue 1) that the floor at the place where plaintiff's wife fell was in a slippery condition and (Issue 2) that this slippery condition was caused by the substances applied by Myrtis Caldwell. However, they found (Issue 3) that a preponderance of the evidence did not show that "the application of such substances by Myrtis Caldwell was negligence." Issue 6 and the answer thereto were: "Do you find from a preponderance of the evidence that the negligence, if you have so found, of Myrtis Caldwell was a proximate cause of the injuries, if any, sus-

tained by Mrs. Lurley Barclay on the occasion in question? Answer 'Yes' or 'No'. Answer: No." The jury assessed plaintiff's damages at $5,996. Some other findings are mentioned below. The trial court rendered judgment for defendant, that plaintiff take nothing and from this judgment plaintiff has appealed.

## Opinion.

The only error assigned in the plaintiff's Points of Error is that misconduct was committed by a member of the jury during the deliberations of the jury which probably caused the jury to return answers to Issues 3 and 6 unfavorable to the plaintiff. Defendant argues in reply that this misconduct was immaterial because defendant was entitled to an instructed verdict, saying that the evidence did not show, either that Myrtis Caldwell had put any substance on the floor which caused plaintiff's wife to slip, or that defendant knew or should have been charged with knowledge that any such substance was there, or that Myrtis Caldwell was negligent in applying to the floor the substances which she had used to clean it. Defendant also argues that defendant was entitled to judgment on the finding under Issue 9, that the condition of the floor was "as open, visible and obvious" to plaintiff's wife as it was to the defendant.

We overrule the latter contention of the defendant. The jury found under Issue 8 that a preponderance of the evidence did not show that plaintiff's wife had failed to use ordinary care to observe the condition of the floor while she was walking on it, and the evidence supports this finding. Furthermore, on grounds now to be stated, we overrule defendant's contention that defendant was entitled to an instructed verdict. The evidence to be considered in connection with this question may be summarized as follows:

The place where plaintiff's wife fell was the local office of the defendant at which defendant made sales to customers from catalogues and books of samples, the

goods ordered to be delivered later; and the room in which this business was conducted was not large. At the left of one entering this room was a table or tables bearing catalogues and books of samples and chairs were placed at these tables for the use of the public. At the right of the entrance there seems to have been a counter at which deliveries of merchandise were made, with an opening in it 12 or 15 feet from the end of the counter near the entrance, and this counter seems to have extended to the rear of the room and across the back of it. The space of floor open to the use of customers was a narrow rectangle 7 feet wide between the tables and counter, extending 29 feet back from the entrance. Adjoining this room on its right and rear was a storeroom for the use of defendant.

We shall refer to this room as the office. The floor of this office was covered with asphalt tile and the evidence is that this tile was in common use as a floor covering and that it was unpolished and that a floor covered with this tile was not slick when there was nothing on it.

Defendant began to use this office (and storeroom) as its place of business on June 22, 1950, and had continued to do so since that time. Defendant had thus been in possession and use of the office for almost three months before plaintiff's wife fell there on September 19, 1950.

A substantial business was transacted at this office. The average number of persons entering the office to transact business with defendant was 100 per day, and there were five employees in this office other than the charwoman Myrtis Caldwell. One of these five was the manager and another was a bookkeeper but the manager also worked as a clerk.

The office closed at 5 o'clock in the afternoon. The evidence does not show when this office opened in the morning, but plaintiff's wife fell in this office at about 11 o'clock in the morning and the manager said that she was completing an order at this time, and we infer that the office had been open to the public for a substantial time before plaintiff's wife fell.

Myrtis Caldwell was employed by defendant to clean the office and storeroom and she had worked in that capacity since defendant began to use the office and storeroom on June 22, 1950. Her method of cleaning the office, and the substances she used were described as follows: She came to the office at 3 o'clock in the afternoon and worked until 5 o'clock except on Wednesday, when she worked until about 5:30 o'clock. She first swept the floor with a broom, dusted the equipment and removed litter from the room and cleaned the storeroom. On each Wednesday after 5 o'clock she cleaned the floor of the office with a preparation called mycoleum which contained soap, and she used a mop for this purpose. When the floor was dry she then applied a liquid called mycogloss to the floor by pouring small quantities of this liquid on the floor from a cup which she had dipped in a can, and she had then spread this liquid more widely by using a mop upon it. This procedure was followed only on Wednesday afternoons. On the other afternoons of the work week, the only substance which she applied to the floor was a liquid called Yarn Broom Dressing. This liquid she mixed with water, either one part of water and four parts of the dressing or vice versa, and she said that she put this mixture in a spray gun and then sprayed it upon a mop she called a Yarn Broom Mop and then passed this mop over the floor of the office. This application of Yarn Broom Dressing was made by her at the close of her day's work.

Myrtis Caldwell said that the mycogloss was used to protect the floor and she described it as having the appearance of water. She said that only about 10 or 15 minutes was required to spread it on the floor and that it dried in about 15 or 20 minutes, or less. Defendant's local manager said that mycogloss was a floor protective and that it left no coat or film on the floor, and that it did not polish the floor. The evidence does not show what mycogloss was made from.

Myrtis Caldwell said that the Yarn Broom Dressing was used to remove dust and dirt from the floor of the office and that this liquid had a brown appearance and looked like ribbon cane syrup but was not thick as syrup is. She said that she had put enough on her mop to remove the dust and that the mop would then be damp. She said further that the mop left no evidence of the dressing on the floor and that the floor did not look damp after she had used the mop in this way, and that the use of the dressing did not make the floor slick. Defendant's local manager said that the dressing did not polish the floor. The evidence did not show what Yarn Broom Dressing was made from.

The procedure described above was followed and the substances mentioned were used by Myrtis Caldwell from the time when the office was established in this place, that is, from June 22, 1950 until a time two or three weeks before plaintiff's wife fell in the office, and Myrtis Caldwell then ceased to use the mycoleum and mycogloss because the supply available to her was exhausted. From this time until plaintiff's wife fell, that is, during a period of two weeks or three weeks, Myrtis Caldwell cleaned the floor of the office on Wednesday afternoons with soap powder dissolved in water which she spread over the floor with a mop. There is a conflict in the evidence as to whether the supply of Yarn Broom Dressing had been used up when the supply of mycoleum and mycogloss was exhausted, and whether Yarn Broom Dressing was applied to the floor during the two or three weeks immediately prior to the day when plaintiff's wife fell; but Myrtis Caldwell gave some testimony that she continued to use the dressing down to the time when plaintiff's wife fell in the office. See pages 21 and 22 of the Statement of Facts.

September 19, 1950, the date when plaintiff's wife fell, was Tuesday. According to the evidence stated, construed most favorably to the plaintiff, the affirmative evidence is that the floor of the office had been cleaned with soap and water on the two preceding Wednesdays, six days and thirteen days before, and on the afternoons of the other work days during these two weeks had had Yarn Broom Dressing applied to it.

There is a conflict in the evidence concerning the way in which plaintiff's wife came to fall and as to what occurred afterward, but plaintiff's wife testified as follows: "As I entered the front door—and went on in to get some of the ladies to exchange my package and I had only made three or four or five steps inside the door going to the counter to get my exchange made. And I lifted my right foot off the floor and my left foot slipped out from under, slipping backward and I fell forward." Her left arm and left knee and leg struck the floor and she also placed her right hand on the floor. "After I fell face downward and the ladies that were working there came out of their little door where the supplies are kept (inferentially, the opening in the counter we have mentioned) and they came out and wanted to help me up and they assisted me to get on my foot." This was her right foot; she could not stand on the left foot. The ladies who had come to her offered her a chair, but she told them that she was unable to sit down and asked to be allowed to support herself by the counter. One of the defendant's employees then notified the plaintiff of this incident and he came to the office and took plaintiff away to a physician. Plaintiff's wife said that until he arrived she "just clung to the counter." Plaintiff himself testified that his wife "was leaning over on the counter" when he came for her.

The plaintiff's wife testified as follows: "—There was oil on my hand where I had fallen with my right hand and my hose over my left knee." She did not say that she got any substance on any other part of her person or of her clothing which came in contact with the floor. Plaintiff testified that when he came for his wife "I wouldn't say I examined it (he refers to the floor) but when I walked in I saw the streak where my wife slipped down." Plaintiff and his wife gave no other testimony on trial about the condition of the floor, but on pre-trial deposition the plaintiff's wife said that she made no inspection of the

area where she fell and did not examine the floor all over to see if it was slippery. Further: "Q. From looking at it did you see any difference from that spot with the rest of the floor with respect to an oily substance? A. No, sir, all the same." Further: "Q. —Was it apparent that the floor was oily or greasy with any substance only at the place you fell or was the whole floor that way? A. It was all over that way. Q. The whole floor was that way? A. Yes."

There was evidence that other persons had slipped and that still others had fallen on the floor of the office before the plaintiff's wife fell there. Mrs. O'Quinn had been in defendant's employ for two or three weeks when plaintiff's wife fell. This was the period during which Myrtis Caldwell said that she used soap and water to clean the office floor on Wednesdays and used yarn broom dressing on other days. Mrs. O'Quinn said that during this period she had seen "maybe one or two slip" on the floor of the office. She said that she had also seen children who had come in with their parents playing in the office by skating across the floor, and the jury were authorized to infer that at least some of this happened before plaintiff's wife fell. Mrs. O'Quinn said that she had never fallen but that "I have slipped a time or two" or "occasionally" and that this experience was "just like I do at home when I wax my floors and walk across them, sometimes I slip." Mrs. O'Quinn did not say whether she had had any of these experiences before the plaintiff's wife fell, but the testimony of Mrs. Irwin, which is mentioned below, that after plaintiff's wife fell a different substance was put upon the floor and the floor ceased to be slippery authorized the jury to find that at least some of Mrs. O'Quinn's experiences had occurred before plaintiff's wife fell. Mrs. O'Quinn's testimony was not inconsistent with Mrs. Irwin's testimony. Mrs. Irwin testified that the floor of the office "was as slick as glass" and that she did not know "what made it slick," and the following testimony of hers shows that this description referred to the period of time before plaintiff's wife fell:

"Q. —Just immediately prior to September 19, 1950 did you notice any appreciable change in the condition of the floor?—Well, did you notice any difference in the condition the week before? A. No, sir. Q. I believe you have previously described it as slick as glass with a high gloss on it. And you notice, or immediately before that there was no change that you noticed? A. No." She testified further that after plaintiff's wife fell "they started using something on the floor so that it would be less slick. It made your feet stick to the floor;" and this change occurred immediately after September 19 "to the best of my knowledge." This testimony shows that the floor was slick before plaintiff's wife fell but not afterwards, and from this the jury could infer that other testimony of Mrs. Irwin's about people slipping and about people falling on the floor referred (at least in substantial part) to the period of time before plaintiff's wife fell. Mrs. Irwin testified that she had slipped on this floor five or six times and had fallen once, bruising her hip, and that she had seen two or three other women (she named two) who had fallen on the floor. She said that she had seen children skating on the floor on several occasions. It cannot be determined from Mrs. Irwin's testimony whether any of the events she related occurred during the period of time when Myrtis Caldwell said that she used only soap and water and the yarn broom dressing on the floor; but, as we have stated, the jury could find that these events did occur between June 22, 1950 and September 19, 1950, since Mrs. Irwin testified to a material change in the condition of the floor after plaintiff's wife fell.

The defendant's manager said that she had not seen children skating on the floor of the office and that she knew of no one having fallen there, and she denied that the floor of the office was slick. However, Mrs. Irwin also gave the following testimony: "Q. I believe you stated now that the floors were slippery and slippery as glass? A. Yes. (Testimony of hers already mentioned shows that she was now referring to the period before September 19, when

plaintiff's wife fell). Q. Was this condition generally discussed in the store? A. Yes.—Q.—Was it discussed in Mrs. Harris' presence (reference is to defendant's local manager)? A. Yes, sir." The jury were authorized to infer that this discussion occurred before plaintiff's wife fell.

We turn now to consider the effect of this evidence.

If we put aside the testimony of Mrs. O'Quinn and Mrs. Irwin the defendant was entitled to an instructed verdict. The defendant's testimony shows a proper use of proper means and the only evidence to the contrary consists of circumstances. Neither plaintiff nor his wife testified to an unusual condition, or, indeed, to any condition at all except that which may be inferred from the presence of some oil on plaintiff's wife's right hand and on her left stocking at the knee, and from a mark on the floor. Neither testified to anything else. What was the oil and how came it to be on the floor? A member of the public could have put it there. There was an opportunity for this to be done before plaintiff's wife fell since the office floor had last been cleaned on the afternoon of the preceding day and the plaintiff's wife fell upon the floor at 11 o'clock in the morning. The substance which plaintiff's wife got on her hand and knee evidently was not soap, which eliminates the mycoleum soap from our consideration, and whether this substance really was oil or not, we see nothing in the evidence by which it can be identified with either the mycogloss or the Yarn Broom Dressing, the only other substances shown to have been put on the floor by the defendant. On such a statement an instructed verdict for defendant would have been rightly given because there was no evidence that defendant knew or should have known of anything on the floor except what defendant put there, and the plaintiff's case was tried and, indeed, was submitted to the jury on the theory that plaintiff's wife was caused to fall by some substance put on the floor by Myrtis Caldwell and the foregoing summary does not prove that such a thing occurred. Specifically, if we put aside

the testimony of Mrs. O'Quinn and Mrs. Irwin, the finding under Issue 2 would be without support in the evidence. The statements taken from the deposition of the plaintiff's wife show that she did not examine the floor and her description of the floor must have been an opinion which was disproved by the use of the floor made by other people at and after the time she fell, and by the failure of the plaintiff's wife to mention oil on any part of her clothes or person except her stocking and her right hand. She did not say that she got anything on her left hand and arm even though this came in contact with the floor, nor did she say that she got anything on any of her clothing other than her left stocking, although she must necessarily have done so if the oil, or if grease had been all over the floor as one statement in her deposition indicates. See Faubert v. Shartenberg's, Inc., 59 R.I. 278, 195 A. 218.

However, the testimony of Mrs. O'Quinn and Mrs. Irwin must be considered because we think that most of it, at least, relates to the time before plaintiff's wife fell and because Mrs. Irwin said that the condition of the floor after the time when defendant's witness said that the mycoleum and mycogloss were exhausted was the same as it had been before that time. The jury were authorized to find, in view of Mrs. O'Quinn's and Mrs. Irwin's testimony that application of soap and water at weekly intervals over two or three weeks did not alter an existing condition. The testimony of Mrs. O'Quinn and Mrs. Irwin tends to prove, either that the substances used and the procedure followed by Myrtis Caldwell before the mycoleum and mycogloss were used up had left a condition which persisted afterward, at least with the use of the yarn broom dressing, or else that the dressing accomplished this result alone. We say this because the condition of the floor was general and existed for an extended period and the defendant's employee Myrtis Caldwell, the only person who cleaned the floor, and not members of the public must have been the cause of it. An analogous inference was drawn by Bury v. F. W. Woolworth Co., 129 Kan.

514, 283 P. 917. While the public might have caused some of the incidents related by Mrs. O'Quinn's and Mrs. Irwin, or some similar incidents, the jury could have inferred from the number and repetition of these incidents that the public did not create the condition which caused them. The aforesaid condition of the office floor, as the effects and consequences of it were described by Mrs. O'Quinn and Mrs. Irwin, was dangerous; it was not the condition which would have resulted from a proper use of proper substances, and the jury could have inferred that defendant, acting through Myrtis Caldwell, was negligent in causing it. See: H. F. Hohlt Co. v. Routt, Tex.Civ.App., 48 S.W.2d 386; Alamo National Bank v. Hazlitt, Tex.Civ. App., 92 S.W.2d 315, 318; Springall v. Fredericksburg Hospital & Clinic, Tex. Civ.App., 225 S.W.2d 232.

Plaintiff's wife's testimony about the oil raises a question, whether the oil or the general condition of the floor mentioned above caused the plaintiff's wife to fall; but the jury could have found that the general condition was at least a contributing cause.

If the defendant created this condition it need not have been known to the defendant's manager. See: The Fair, Inc., v. Preisach, Tex.Civ.App., 77 S.W.2d 725; Robinson v. F W. Woolworth Co., 80 Mont. 431, 261 P. 253; Hulett v. Great Atlantic & Pacific Tea Co., 299 Mich. 59, 299 N.W. 807; F. W. Woolworth Co. v. Saxon, 39 Ohio App. 118, 177 N.E. 219. However, testimony by Mrs. Irwin that the condition of the floor had been discussed in the presence of the defendant's local manager is some evidence that the manager had notice that the condition existed before plaintiff's wife fell.

It results from these comments that the defendant was not entitled to an instructed verdict and we are thus brought to consideration of the Points of Error assigned by the plaintiff, in which it is contended that the verdict probably was the result of misconduct by one of the jurors during

the deliberation of the jury upon their verdict.

The only charge of misconduct which we need consider is stated in Grounds 10 and 11 of the plaintiff's amended motion for new trial and consists of statements by the juror Westbrook to the other jurors, made while the jury were considering the answers to be returned to Issues 3 and 6 and when the jury were divided upon these answers, that it was immaterial how these two issues were answered because the Barclays would get the money anyhow since the majority of the issues had been answered *yes* and had found the amount of damages. Plaintiff alleged that the jury then agreed to answer Issues 3 and 6 *no*.

Plaintiff's allegations of misconduct were tried and seven jurors testified at the hearing. The trial court made no independent findings of fact but the order overruling the plaintiff's motion for new trial contains this statement: "—The court so find that (1) the misconduct complained of was not material and that it does not reasonably appear from the entire record of the case that injury probably resulted to the plaintiff." We construe this statement as an implied finding that the misconduct charged did occur and the evidence summarized below supports the finding. However, there is really no substantial dispute in the evidence regarding material misconduct on the part of the jury and this evidence proves as a matter of law that at least the material part of the misconduct charged by plaintiff did occur. We note that the only argument made by the defendant concerning misconduct is that the evidence proved only the operation of mental processes of the jury. It is not contended otherwise by the defendant that the misconduct charged did not occur. The evidence to be considered, regarding misconduct and its effect, is the following:

Westbrook testified, in substance, that the issues were taken up for consideration in the order in which they were arranged in the charge and, excepting Issues 3 and 6, were answered in that order, at least

down through Issue 7, which submitted the question of damages, but that when the jury came to Issue 3 and later to Issue 6 they fell into disagreement about the answers to be returned to said issues and further consideration of Issues 3 and 6 was postponed. After all of the other issues had been answered, or all of the first seven except Nos. 3 and 6, the jury again took up the consideration of 3 and 6 and eventually answered both of them *no*. This answer entailed a change in the votes of several of the jurors on both of said issues. Of the seven jurors who testified five confirmed this testimony of Westbrook, either expressly or impliedly, in whole or in part, and there was no affirmative contradiction of Westbrook. Juror Borders first thought that Issue 3 was answered when the jury first took it under consideration, but his subsequent testimony shows that while he remembered that some issues were skipped, he did not remember the order in which the issues were answered. He first thought that Issue 6 was answered last but he was not sure. There is no substantial conflict between Borders and the other six jurors regarding the matter we have stated.

Westbrook admitted, in substance, that during the final deliberation of the jury upon Issues 3 and 6 he informed the jury that the answers to these two issues were immaterial. There was no dispute about whether Westbrook made such a statement. Four of the other jurors remembered that he had done so. Borders thought that either Westbrook or some person who lived in Westbrook's neighborhood had done so. Pittman testified to no misconduct by Westbrook but his testimony is not in contradiction of Westbrook's; he only remembered that Westbrook had argued that Myrtis Caldwell had been negligent. Some of the jurors who testified remembered this statement as having been made during the discussion of both Issues 3 and 6 and others remembered such a statement during the discussion of Issue 3 but we note that all of the jurors were not questioned about the same things and we do not regard the evidence regarding this statement of Westbrook's as being in conflict. It is apparent from the testimony of all of the jurors other than Pittman (who testified to no misconduct) that Westbrook made this statement in an argumentative way and that he repeated it and did not say it only one time.

We find no real dispute as to when these statements were made by Westbrook. Three jurors, Crain, Borders and Wilson confirmed Westbrook's testimony about time. Grimes said Westbrook had made the statement during the deliberation of Issue 3, and Morehead's testimony is that Westbrook made such a statement when Issue 3 was under consideration the first time; but neither Grimes nor Morehead denied that Westbrook made the statement at other times. As we have stated, all of the jurors were not questioned about the same thing and the fact that some jurors attached the statement to both Issues 3 and 6 while others attached it to only Issue 3 is not regarded as producing a conflict in evidence as to when Westbrook really said such a thing.

As we have stated, it is apparent from the testimony of all of the jurors except Pittman that Westbrook made these statements in an argumentative way and repeated them, evidently as the course of the discussion required. According to Westbrook he also told the jury, in connection with the basic statement we have just discussed, that Mrs. Barclay would get the money anyway (that is, regardless of the answers returned to Issues 3 and 6) and gave as his reasons for this and for the basic statement just discussed the fact that they had answered most of the issues in plaintiff's favor and had found the amount of the damages. There was confirmation of various parts of this testimony of Westbrook, and although all of the jurors who were examined did not testify that he made all of these other statements, we find no real contradiction by any juror of this testimony by Westbrook and note again that all of the jurors who testified were not questioned about the same things. There was testimony from Crain that Westbrook had made a statement that the answer to Issue 3 was immaterial because the jury

had already found the floor slippery, and Borders testified regarding Issue 3: "Q. Before answering that issue—was a statement made by anyone concerning as to whether or not it made any difference as to how that issue was answered? A. It was made, I don't know in just what words, but by someone in some manner, but I don't remember just how it was all brought about, but it was made." It is certainly clear that Westbrook told the jury during the final deliberation on Issues 3 and 6 that the answers to these issues were immaterial for one or more of the improper reasons we have questioned.

The basic statement made by Westbrook and the reasons given by him for his conclusion was misconduct and it seems to be a frequent sort of misconduct. See Walker v. Quanah, A. & P. Ry. Co., Tex.Com.App., 58 S.W.2d 4; Allcorn v. Ft. Worth & R. G. Ry. Co., Tex.Civ.App., 122 S.W.2d 341; Figula v. Ft. Worth & D. C. Ry. Co., Tex. Civ.App., 131 S.W.2d 998; Pryor v. New St. Anthony Hotel Co., Tex.Civ.App., 146 S.W.2d 428; Pope v. Clary, Tex.Civ.App., 161 S.W.2d 828. Concerning the question, whether Westbrook's statements were misconduct but only on this issue we also cite Mann v. Cook, Tex.Civ.App., 11 S.W.2d 572; Warnack v. Conner, Tex.Civ.App., 74 S.W.2d 719; Harkins v. Mosley, Tex. Civ.App., 134 S.W.2d 706; Dwyer v. Southern Pacific Co., Tex.Civ.App., 141 S.W.2d 961; Biers v. Ft. Worth Lloyds, Tex.Civ.App., 219 S.W.2d 493.

Westbrook said that he first voted to answer Issue 3 *yes* but it is apparent that he later took the lead in bringing about the *no* answers returned to Issues 3 and 6 (perhaps because he believed his own arguments that these answers were immaterial) and that his arguments, whether the proper ones remembered by Pittman or the improper ones remembered by the others, were the principal factor in causing the jury to answer these issues as they did. Borders, the foreman, said that Westbrook took quite a lead in the talking or discussion in the jury room and Morehead said: "—I know he done most of the talking." Crain said: "—We finally went along with

him." Pittman, who testified to no misconduct, said, however, about Issue 3: "And as we argued along on it we would fall over in line with him." Westbrook did not testify regarding these matters except to say that he had first voted to answer Issue 3 *yes*. He never did say when he changed his vote nor why.

There is no evidence that any one attempted to prevent this improper discussion or that anybody thought the discussion was improper. The testimony summarized indicated that it was not regarded as improper.

There is testimony from several jurors that they believed Westbrook's improper statements and because of these statements agreed to answer Issues 3 and 6 *no*. The testimony regarding the effect of the misconduct upon the conclusions arrived at by the individual jurors was incompetent under the rule stated in Traders & General Ins. Co. v. Lincecum, 130 Tex. 220, 107 S.W.2d 585. It is held in many decisions such as Phillips v. Texas & Pacific Ry. Co., Tex.Civ.App., 223 S.W.2d 258, that the question, whether the misconduct affected the verdict, is one of law. In considering this question, we have also given no weight to testimony of jurors that they believed Westbrook's statements although we have not undertaken to determine whether such testimony is incompetent or not.

However, it seems at least probable that under the evidence we have summarized the misconduct of Westbrook did affect the answers returned to Issues 3 and 6. The jury were in disagreement regarding these two issues and the division was substantial, both as regards the number of jurors on each side and the firmness of position taken; these issues had been taken up once and consideration postponed. We have not referred to the fact but the testimony of four of the jurors, namely, Westbrook, Crain, Pittman and Grimes, shows that they wanted to return a verdict in favor of the plaintiff, and Westbrook's misconduct was directly calculated to affect

the answers returned by such persons. Of these jurors other than Westbrook, at least Crain and Grimes did hear Westbrook's statements.

We sustain plaintiff's Point 2.

The judgment of the trial court is reversed and the cause is remanded.